# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

KENNETH HAWKINS,

          Petitioner,

    v.

GENA JONES,

          Respondent.

No.  2:23-CV-0641-DJC-DMC-P

FINDINGS AND RECOMMENDATIONS

Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Pending before the Court are Petitioner's petition for a writ of habeas corpus, ECF No. 1, Respondent's answer, ECF No. 30, and Petitioner's traverse ECF No. 31.

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  Under AEDPA, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in

/ / /

/ / /

/ / /

1

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at

2

406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See Wiggins v. Smith, 539 U.S. 510, 520 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 538 U.S. at 75-76. This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 223 F.3d at 98 2. The federal habeas court assumes that state court applied the correct law and analyzes whether the

3

state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

## I. BACKGROUND

### A. Facts[1]

At the outset, the Court observes that this case is limited to Petitioner's Claim One alleging that admission of testimony at trial violated his rights under the Confrontation Clause of the United States Constitution. See ECF Nos. 25, 26, and 27. The state court summarized the issue as follows:

> In this appeal, we address an exception to a criminal defendant's right to confront witnesses, the doctrine of forfeiture by wrongdoing. Defendant Kenneth Lequiez Hawkins was Sarah Doe's pimp. He was arrested shortly after an incident in which he beat her and forced her to go into a vehicle and perform oral sex on a man. Doe gave two statements to the Sacramento police inculpating defendant. When she failed to appear, the trial court, over defendant's objection, granted the prosecution motion to admit her two statements to a police officer and a detective, finding the forfeiture by wrongdoing exception applied because defendant had facilitated Doe's failure to appear.
>
> * * *
>
> On appeal, defendant contends admitting Doe's statements to the police violated his right to confrontation. . . . The trial court's finding that defendant induced Doe not to testify through wrongdoing was based on preliminary hearing testimony showing defendant was in a control relationship with Doe, a call he made to her from Sacramento County jail in which defendant told Doe she needed to fix what happened, calls to other parties from jail in which defendant emphasized the importance of Doe not testifying, and evidence that Doe had been contacted by others who appeared to be acting on defendant's behalf and in defendant's interest while defendant was awaiting trial. . . .
>
> ECF No. 29-12, pgs. 1-2.

///

///

---

[1]    Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence. See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012). Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

4

The state appellate court then recited the following facts relevant to Petitioner's Confrontation Clause claim, specifically the facts surrounding Doe's recorded statements, and Petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

Sacramento Police Officer Michael Nelson took a recorded statement from Doe at the hospital. Doe had known defendant for about two months, meeting him at Wellness and Recovery Center where she used to work. She gave him her number and they started dating.

According to Doe, defendant had "anger issues." He would put his hands on her or try to have others do the same. Defendant was not violent at the beginning of their relationship; he got violent when he thought she was being sneaky or doing things behind his back.

Doe and defendant were with each other much of the time; they usually rented a room or slept in the vehicle. Defendant first asked her to have sex with someone else about a month before the interview and had asked her to "trick" between five and ten times. Doe did not always comply with the requests. When she told defendant she did not want to comply, defendant would start to hit Doe in front of other people, telling her, "[N]obody aint gonna save you! Nobody's going to fucken save you." This embarrassed her, so Doe would tell defendant to just stop as she did not want to get law enforcement involved.

Doe set her own prices. When asked by Officer Nelson, "[h]ow much money do you make doing that," she answered, "[p]robably like four [hundred], depending on how I feel." She would charge $150 for an hour-long date and give defendant $100 of that, even though Doe thought defendant did not deserve it. She met customers online, over the phone, or on the street. Doe met customers in their house or on "car dates," with defendant driving her to the dates. Doe learned about prostitution from her cousin and had been engaged in it for around two years.

Doe told Officer Nelson the blood in defendant's vehicle was from her injury. She injured her hand a couple of days earlier when she held it up to block defendant from striking her face. Doe's injuries were caused by defendant's attacks on that day and a few days before. Defendant had told Doe, "go out there and get me some money!"; when she declined, defendant got mad, slapped Doe, and took her to his cousin's to have someone jump her "for lying and not telling him the truth." Doe sustained the injury above her eye in San Pablo, outside San Francisco, when defendant pushed her, causing her to fall.

The incident at the parking lot started when defendant got mad because he wanted to get money from a "trick" but Doe had walked the wrong way. When they got to the parking lot, defendant opened the door and his "homeboys" were there recording her and saying, "choose up! Choose up! . . . . I know you wanna choose up bitch!" Defendant saw a man walking down the street and asked him, "you want some pussy?" The man pulled out his penis and defendant told Doe to suck it, but she said that she did not want to. Defendant told her the man had paid for it, but Doe knew he had not paid. As the man sat inside the car while Doe was on her knees, defendant told Doe, "[S]uck it! I don't give a fuck. You gonna do whatever the fuck I tell you to." He also told her to "suck his dick, this is what you like to do for free." Defendant was holding a blue metal baseball bat with a black grip. He threatened to hit her with the bat if she

5

did not perform oral sex on the man.2 Doe told defendant she would not, but nonetheless pretended to perform oral sex on the man. [FN2] She had only touched the man's penis and put her hands on top of each other. The incident ended when someone said police were coming.

> [FN2] Doe said that defendant never hit her with the bat but previously had hit her with other items, such as striking her head with a curling iron.

Defendant never forced Doe to have sex with him but would force her to have sex with other people when she did not want to. When that happened, defendant would get mad at Doe and expected her to listen to what he told her. She last had sex with a "trick" a few days before the interview when defendant drove her to San Francisco. He last got mad at Doe for not having sex with another man about a week before the interview with Officer Nelson. Defendant would try to embarrass her; Doe would run away but defendant would threaten to kill her. She told defendant she was afraid and wanted to be taken home, but defendant said he would not take her home and told Doe she would be with him for the rest of her life.

Doe told Officer Nelson she did not want anyone to know where she was because defendant's cousins told Doe they would find her and beat her if she put defendant back in jail. Defendant had previously told Doe, "I should just kill you since you don't want to live," and had said something like this that day, before the parking lot incident. He had also told Doe, "I should just kill you for not motherfucking listening . . . . I should just go get the gun and just kill you."

Doe was glad the police came as she had been trying to get away from defendant for "hecka long." She never called the police because defendant took her phone and would give it to her when she was "out making some money."

Doe was interviewed later that day by Sacramento Police Detective Jason Collins. Defendant had become angry at her for not making gas money. She called defendant her boyfriend, but "everybody" called him her pimp. She started working for defendant while they were dating; it was "all cool" until defendant thought she was being sneaky and lying.

Doe had started "working" when she was 15 years old and had been working on her own without any "dudes." She posted ads and liked what she did because it paid well. Doe stopped for two years after she had her child. She identified defendant as her "dude."

Defendant had been fine with Doe being a prostitute; she told him about a week after they started dating. He started hitting her and accusing her of lying about a month into their relationship. Defendant thought she had "choosed up on somebody else" but this was not true. When Doe told defendant she had gone to see a customer, defendant would accuse her of lying and questioned how much money she was giving him Doe primarily posted her advertisements on the websites List Crawler or Skip The Game and used her own phone number. She did the ads without defendant's help, although he would drive Doe to her dates. She gave defendant about $150, depending on how much she made. Doe charged $100 to $150 for a 30-minute date, $200 for an hour, and $60 for a "quickie." She did primarily "car dates" and would make about $400 a night working every other day. In exchange for Doe giving him money, defendant would buy her food and clothes.

6

Doe believed she had given defendant $500 in the two months they had been together. Although defendant did not get very "pimpy" with her, he would get aggressive with her when he thought she was lying and would threaten to beat her up. Defendant considered himself her pimp and was managing her. He was trying to get money from her and would put his hands on her if she did not follow his instructions and directions. Defendant would take her down to the "blade" [FN3] every day, where she would work from 8:00 p.m. to midnight. While there, defendant would tell her what to do and how to do it, and he would threaten her.

[FN3] The "blade" is an area where street prostitution takes place.

Defendant had threatened Doe's life. He told Doe he would shoot her or find her and beat up Doe and whoever she was talking to. Doe did not know if defendant would carry out the threats, but she wanted to get away from him.

ECF No. 29-12, pgs. 4-8.

The state appellate court also summarized additional facts related to Petitioner's communication with Doe and others after his arrest as follows:

The prosecution moved pretrial to admit Doe's statements to the police. The following facts were adduced at the Evidence Code section 402 hearing on the matter.

On March 23, 2020, defendant called Doe from the Sacramento County jail. During the call, defendant told Doe she should try to "write a email explaining, you know, saying everything. Because at this stage of the game, they'll be fixing to let go folks out the people. I might qualify for that shit." He told Doe, "I don't feel its right for me to be up in here and you doing you know what I'm saying. You living your life and I'm up in here you just feel me." Defendant said that he wanted to "be able to live my life how you living yours right now," and "for that to happen shit, you gotta do some things sh- you know, to fix what occurred."

After telling Doe that his attorney had told him about her statements to the police, defendant said, "All that shit was fairy tale, you feel me. So you have to fix that somehow, someway, I don't know the procedures or what you gotta do to go about. But I would truly appreciate that. So I can go on about my life." He later told Doe, "Like, come on, baby. Now, you supposed to better than that for me. I thought you was gonna really hold me down and represent me the right way. But I'm feeling and you gotta understand. . . we done shared something intimately before, right? So, every time you're doing something, I feel every time you do it." Doe replied, "Yeah, when we were good we shared."

When Doe later called defendant a "weirdo," he replied, "You is hella out of pocket," and later told her, "why is you being so difficult . . . ? Like this . . . is some out of pocket shit ever love."

On July 20, 2020, Doe was served with a subpoena to appear in court for this case. The following day, Investigator Fucles received a voicemail from Doe expressing concerns about being contacted by defendant. Fucles called Doe at the number she provided. Doe told Fucles she did not want defendant to be able to contact her on a different number, and that she wanted a restraining order against him. Doe told

Fucles that defendant had not threatened her, but he had told Doe not to testify.

A no-contact order was issued on July 28, 2020.

On August 19, 2020, Fucles and Doe made plans to meet in two days. Fucles called and texted Doe after she failed to show up; Doe replied that she had a family emergency and needed to reschedule. They agreed to meet on August 24, 2020, but Doe neither appeared nor responded to Fucles' messages. Fucles drove to an address Doe gave her; the man who answered the door said Doe was not present and did not live there. Fucles texted Doe the following day to remind her of her August 2020 court date, but Doe did not respond.

Doe was scheduled to appear in court on August 26, 2020. While Doe responded to Fucles' text that day and affirmed she was coming, Doe did not appear. Doe called Fucles at the end of the day and asked if a warrant had been issued for her. Fucles told her a stayed bench warrant was issued that day. They agreed to meet on September 2, 2020.

On August 31, 2020, Doe received a call from another Sacramento County jail inmate, Devon Smith. Smith told Doe that "Kinki" [FN4] was going to court that day and he "just want to make sure you don't come and shit like that." Doe replied that she was not going to court. Smith told Doe, "Alright Yeah well he said try to uh he said he said if you had me and he said stop talking to the DA you know what I mean cause he's trying to get out and shit and he said just uh he says it's just uh you know like uh it's probably just play things in his favor do you know what I mean?. . . .Because the negative is trying to he's trying to beat this case you hear me?" Doe stated that she understood.

[FN4] The prosecutor argued that while the transcript read, "Kinki," the recording actually sounded like, "Ken-Ken," a reference to defendant, Kenneth Hawkins. The prosecutor also noted there was a reference to defendant as "Ken-Ken" in a September 9, 2020, call from Sacramento County jail.

Smith continued, "And he's going to trial today so you just want to make sure that you don't you know I mean just don't show up to like no court date you know they just they'll stay away from the DA don't talk to him and everything like that hear me?" Doe replied, "Uh huh."

Doe did not show for her September 2, 2020, meeting with Fucles. Doe did not reply to a text message from Fucles offering to pick her up.

Fucles found that an ad featuring Doe was posted in Palm Springs on September 7, 2020. The following day, Fucles texted Doe a reminder that she had to be in court the next day. Doe replied "okay." Doe did not show up for her September 9, 2020, court appearance. Fucles could not find Doe at two of her known addresses. She also left a voicemail and sent her a text message that showed a read receipt.

On September 9, 2020, defendant made a call using another inmate's PIN to Doe's number and spoke to a woman other than Doe. Defendant told the woman she needed to "knock her." The woman asked, "Knock who?" and defendant replied, "The one you been tappin in with? Man you need to go ahead and knock her bruh." When the woman said she was not doing it, defendant told her, "[Y]ou're doing what we have to do to in order for us to win."

///

8

The woman asked defendant what happened in court. He replied that a bench warrant was issued for "lil mama that I'm in here for." Defendant told the woman, "Now, they're like, if she uses her identification or anything, they can use it to hunt her down, so now they're on a hunt trying to like find out where this person is through her phone, or um, you know what I am saying. Trying to track her down . . . ." He later said, "so they may more than likely just drop this case but they're like, 'you're [sic] honor if we arrest her, we gonna bring her in, in cuffs,' you see what I'm saying. If she's not in our county, we can have her arrested in whatever county she's in and then ship her back to our county. You see what I'm saying so at the end of the day all she gotta do is lay low. Stay out of the way and don't come in contact with no police." The woman replied, "Well, I'll tell her that when I talk to her."

Defendant told the woman, "I aint supposed to have no contact with her, even though I want to talk to her hellabad, you feel me, I aint gonna lie, I'm trying to slide up to her." Later, the woman told defendant that upon hearing that "she put your ass in jail [N-word] I beated her ass and I don't give a fuck but for her just to think it's okay and have my [N-word] or my husband in jail behind your ass, bitch no." The woman had asked Doe to go to Las Vegas with her, but she declined. Defendant replied, "All we on is making sure motherfuckers is in the right state of mind."

Defendant said that if "she go to court, I'll get sixty years because no matter what she say, they're going to go off the paper." When the woman responded, "what if she go to court and say that was all a lie," defendant countered, "they gonna put her on the stand and say that she lying." Defendant told the woman, "All they want her to do is get on the stand and say yeah your honor I said that. I get sixty years for that . . . ."

The woman told defendant she talked to "her" last night and she said that she was in Sacramento and wondered if defendant had called her. The woman told her, "I don't want anything to do with you. I'm only dealing with you because Ken Ken wanted me to deal with you." Defendant instructed the woman, "when you do communicate with her, you gotta let her know to stay out the way, you feel what I am saying." When the woman said she would call her, defendant replied, "they're going to drop this but tell her she need to quit communicating with them people. You feel what I'm saying, she need to quit talking to them cause that was making them feel like they got a case. They were still offering me twenty-one years." Defendant reiterated, "she don't need to show up, cause we don't need her getting on the stand. We don't need her getting on the stand." The woman suggested getting her out of town on the train, "because if she's in Sacramento and gets arrested, there's nothing I can do." When defendant asked the woman if she would do everything she could to get him out, the woman replied that she would talk to her and "choke her;" defendant said not to choke her, just "knock her."

ECF No. 29-12, pgs. 12-16.

/ / /

/ / /

/ / /

/ / /

9

**B.**     **Procedural History**

1.     State Court

Following a jury trial, Petitioner was convicted of human trafficking, pimping, and pandering.  See id. at 2.  Petitioner was sentenced to 28 years to life in state prison.  See id. The California Court of Appeal affirmed the conviction and sentence.  See ECF No. 29-12.  The CF No. 14-2. The California Supreme Court denied direct review without comment or citation.  See ECF No. 29-14.

2.     Federal Court

Petitioner filed his petition for writ of habeas corpus alleging three grounds: (1) wrongful admission of statements after finding of forfeiture by wrongdoing, (2) due process violation and (3) insufficient evidence to prove the elements of human trafficking. See ECF No. 1, pg. 3.  On July 12, 2024, the District Judge issued an order dismissing Ground Three with prejudice for failure to state a cognizable claim, dismissing Ground Two without prejudice as unexhausted, and staying the action to allow Petitioner to exhaust Ground Two in state court.  See ECF No. 19.  On December 8, 2025, the District Judge issued an order lifting the stay following exhaustion of Ground Two in state court and directing that Petitioner move to amend the original petition to re-allege the newly exhausted claim.  See ECF No. 25.  After Petitioner filed to move to amend the petition within the time provided by the District Judge, the Court directed Respondent to file an answer as to the remaining Ground One.  See ECF No 27.  Respondent lodged the complete state court record on March 10, 2026, see ECF No. 29, and thereafter filed an answer as to Ground One on March 19, 2026, see ECF No. 30.  Petitioner filed a traverse on March 23, 2026.  See ECF No. 31.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

10

## II. DISCUSSION

In Ground One, Petitioner claims the state court's determination amounted to an unreasonable application of federal law through an incorrect finding of forfeiture by wrongdoing. The California Court of Appeal began its analysis of Petitioner's claim with the following discussion of controlling federal law:

> Defendant contends the trial court's decision to admit Doe's statements to the police under the forfeiture by wrongdoing exception deprived him of his right to confrontation.
>
> * * *
>
> As interpreted by the United States Supreme Court in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] and its progeny, the Confrontation Clause generally bars admission of "testimonial" hearsay statements against a defendant unless the declarant is unavailable to testify, and the defendant had a previous opportunity to cross-examine the witness. (Id. at pp. 53-54, 59, 68 [158 L.Ed.2d at pp. 194, 197, 203]; *People v. Sanchez, supra*, 63 Cal.4th at pp. 680, 687.) One recognized exception to the confrontation clause is when a witness's absence is procured through the defendant's own wrongdoing. (*Crawford, supra*, at p. 62 [158 L.Ed.2d at p. 199.) This exception, commonly known as "forfeiture by wrongdoing," has its foundation in the equitable maxim that "no one shall be permitted to take advantage of his own wrong." *Reynolds v. United States* (1879) 98 U.S. 145, 159 [25 L.Ed. 244, 248].)
>
> The United States Supreme Court has explained the theory behind the forfeiture-by-wrongdoing doctrine in the following manner: "[W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system." (*Davis v. Washington* (2006) 547 U.S. 813, 833 [165 L.Ed.2d 224, 244].) The forfeiture-by-wrongdoing doctrine is "grounded in 'the ability of courts to protect the integrity of their proceedings' " by " removing the otherwise powerful incentive for defendants to intimidate, bribe, [or] kill the witnesses against them . . . . " (*Giles v. California* (2008) 554 U.S. 353, 374 [171 L.Ed.2d 488, 504] (*Giles*).)
>
> For the forfeiture-by-wrongdoing exception to apply, a defendant must have caused a witness to be unavailable by wrongful conduct intended to cause the witness to be unavailable. (*Giles, supra*, 554 U.S. at p. 367 [171 L.Ed.2d at p. 500]; People v. Merchant (2019) 40 Cal.App.5th 1179, 1185.) The exception applies "not only when the defendant intends to prevent a witness from testifying in court but also when the defendant's efforts were designed to dissuade the witness from cooperating with the police or other law enforcement authorities." (*People v. Banos* (2009) 178 Cal.App.4th 483, 501.) The exception applies if "at least one" of the

///

///

11

defendant's reasons for committing the wrongdoing was to make the declarant unavailable as a witness. (*People v. Quintanilla* (2020) 45 Cal.App.5th 1039, 1049.)

ECF No. 29-12 pgs. 17-19.

Because the state court applied clearly established rules of federal law under Crawford and Giles, this Court finds that the state court's decision was not contrary to controlling federal law.  The issue, then, is whether the state court's application of the forfeiture-by-wrongdoing exception was based on a reasonable application of the facts.  The Court finds that it was not.

Forfeiture by wrongdoing is the "permitted . . . introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant." Giles v. California, 554 U.S. 353, 359 (2008).  The state appellate court discussed this issue as follows:

> Defendant did not directly ask Doe to refrain from testifying when he called her from the Sacramento County jail. He did tell Doe that her statement to the police was false, it had harmed him, leaving him in jail while she was free, and asked Doe to help him, telling her, "I don't know the procedures or what you gotta do to go about. But I would truly appreciate that. So I can go on about my life." This open-ended request for help does not necessarily suggest that Doe rectify the matter by testifying in court and refuting her prior statements. During the call, defendant suggests a different means of helping him, asking Doe to "write an email explaining everything, you know, saying everything" and to "fix what occurred." Although defendant never addressed whether Doe should testify, he did try to instill guilt in her for her statements to the police implicating him when he told Doe it was not right for him to be in jail while Doe was "living your life . . . ." Defendant also told Doe that she was "out of pocket," which according to Fucles' testimony at the hearing, refers to a prostitute not behaving or acting in a manner that her exploiter expects.
>
> Although defendant did not directly ask or tell Doe not to testify, after Doe was subpoenaed, she told Fucles that defendant had contacted her and told Doe not to testify, which in turn led to the no-contact order. This in turn must be evaluated in light of that other factor cited by the trial court, the preliminary hearing testimony regarding defendant's relationship with Doe. The preliminary hearing testimony largely consisted of Officer Nelson and Detective Collins relating the contents of their respective interviews with Doe. This testimony included Doe describing to Officer Nelson how defendant acted as her pimp and how he would use violence against her, how he had threatened to harm Doe and those with her if she ever left him, and how he would monitor Doe when she was working to control her. Doe's reaction to defendant's conversation is better understood and more reasonable when viewed in the context of their relationship. (See Giles, supra, 554 U.S. at p. 377

12

[171 L.Ed.2d at p. 506] [noting that "[a]cts of domestic violence often are intended to dissuade a victim from resorting to outside help . . . ."]; Davis v. Washington, supra, 547 U.S. at pp. 832-833 [165 L.Ed.2d at pp. 243-244] [domestic violence offenses are notoriously susceptible to intimidation or coercion of the victim].)

The second and third calls both show that attempts were made to directly dissuade Doe from testifying in defendant's case. The unidentified woman with whom defendant spoke in the third call told defendant she had contacted Doe and took instructions from defendant on what to do when she contacted Doe again. She had apparently already contacted Doe before the call, as she told defendant she had beaten Doe after the woman heard that Doe was responsible for defendant being in jail. During the call, defendant correctly states that having Doe appear and refute her prior statements through testimony would not prevent the prior statements from being admitted into evidence. He accordingly discussed with the woman the importance of Doe not testifying and how to keep her from testifying in his case. During the discussion, defendant tells the woman to "knock" Doe, a reference to hitting her. In so doing, defendant tells the woman that "you're doing what we have to do to in order for us to win." Defendant also admits that he was legally banned from contacting Doe, but nonetheless he was trying to "slide up" to her.

While this conversation took place on September 9, 2020, after Doe had placed an ad in Palm Springs, this does not mean, as defendant argues, that Doe already was rendered unavailable when the third call happened. Although Doe had failed to make appearances or keep appointments associated with the case by the time of this call and had placed the ad in Palm Springs before the call, this call nonetheless took place before the September 11, 2020, Evidence Code section 402 hearing and on the same day Doe had been scheduled to appear in court. The fact that Doe was potentially in another location, such as Palm Springs or Las Vegas [FN7] at some point before the call does not render her unavailable; she could change her mind and subsequently decide to testify. In the third call defendant expressed his desire for Doe not to testify and instructed the woman he called to keep Doe from testifying. The trial court could reasonably conclude that this was successful, and Doe was persuaded not to testify.

[FN7] Doe's ad in Palm Springs said that Doe was in Las Vegas.

The third call also provides important context for the second call involving Doe and another inmate at Sacramento County jail, Smith. The third call shows defendant's willingness to employ other inmates to help him keep Doe from testifying without it being traced back to him. There is no evidence that Smith had any prior relationship with Doe or reason to be interested in a case against defendant in which Doe is expected to be the primary witness. Given the circumstances of the third call, it is reasonable to infer that as in that call, the second call involved defendant utilizing a fellow inmate and a third person to keep Doe from testifying without it coming directly from defendant.

In applying the substantial evidence test, " a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (People v. Edwards (2013) 57 Cal.4th 658, 715.) The inferences the trial court made in finding the forfeiture by wrongdoing exception applied were reasonable. Defendant was in an abusive relationship with Doe, told Doe

13

he wanted her to fix the problems caused by her inculpatory statements, and later successfully used other people to try to dissuade her from testifying, in one case discussing having force used on Doe. This is substantial evidence showing defendant committed acts causing Doe to be dissuaded from testifying, and in so doing intended for her not to testify. Substantial evidence supports the trial court's ruling that the forfeiture by wrongdoing exception applied.

ECF No. 29-12, pgs. 21-23.

Regarding the forfeiture-by-wrongdoing issue, the United State Supreme Court is clear that a "witness [being] kept back or detained by means *or procurement* of the defendant" qualifies as forfeiture by wrongdoing." Giles, 554 U.S. at 355 (emphasis added).  Here, asking another prisoner to call and direct Doe not to testify, asking someone to physically harm Doe, and telling Doe to fix a situation all show how Petitioner procured means to stop Doe from testifying. The state appellate court's decision reflects this same understanding, and this Court finds that the state appellate court's application of the facts to this case was not unreasonable under Giles.

### III.  CONCLUSION

Based on the foregoing, the undersigned recommends that Petitioner's petition for a writ of habeas corpus, ECF No. 1, be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 2, 2026

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

14